JOHN BROWN AND JANE BROWN v. ADEL BELMARDE.

*Error from Jefferson County.*

Prior to the treaty of June 3, 1825, with the Kansas Indians, they had the "Indian title," *i. e.* a life interest in the usufruct of a body of land in Eastern Kansas, including that in controversy, the United States holding the ultimate title, charged with this interest of the Indian nation, so long as they should remain a nation.

This "Indian title" was by the sixth article of that treaty, vested in certain individuals,—that to the land in question in Lavonture.

From the death of Lavonture in 1847 or '48 to the passage of the act of Congress May 26th, 1860, the whole title to the land in question was in the Government, and that act operated as an original grant to certain reservees and the "heirs of deceased reservees" mentioned therein.

"Heirs of deceased reservees" used [therein is *descriptio personæ*, and is to be construed with reference to, and determined by the law at the time the estate passed, and whoever under the laws of this state would have inherited, had Lavonture died May 26th, 1860, (the date of the approval of the act of Congress,) are the persons to whose benefit the grant inured, and a charge by the court below to that effect, would have been proper in an action of ejectment to recover the land in question.

But it was not error to refuse to charge that Mrs. Brown would be the sole heir if she and Lavonture were lawfully married, and that L. died prior to

6

1860, having a child living, which child died prior to 1860, leaving no issue. Under §§ 18 and 19 of act of Feb. 8th, 1859, the mother could take only in case there was neither wife nor husband nor issue surviving.

Section 18 would sustain an instruction in such case substantially, "that if Martin Trapp, the former husband of Mrs. Brown was dead, and afterwards Mrs. Brown and L. were married, upon the death of L. without children, Mrs. B. would be the only heir," and should have been on request given to the jury.

*Semble*, under section 24, the issue of a man and his mistress might inherit from the father, if recognized in the manner pointed out, but the issue would be illegitimate.

It was not intended by "illegitimate" used in the act of 1859, to mean a class who could not inherit from the father. The word had "acquired a peculiar and appropriate meaning in the law" within the meaning of subd. 2, section 1 of act of 1859, [*Ch*. 188 *Comp. L.*, *p*. 838,] and under the common law adopted at the same session as "the rule of action and decision," it meant "children born out of lawful wedlock." There must have been a valid marriage, which could not have been in this case, if a husband or wife were living—the marriage relation still subsisting,—and an instruction asked, "that if Mrs. B. and L. were married according to the forms of law, the issue would not be bastard, although Mrs. B. may have had another husband living at the time; that if L. had a child by Mrs B. after said marriage, the child would be entitled as heir to all the interest and right of L. in the land, and upon the death of the child without issue, the said interest would pass to Mrs. B. the mother;" *Held*, to have been properly refused.

Section 10, act 1855, p. 308, repealed in 1859, would not cure the marriage, as the child was born and the father died before the end of 1848, and the record does not show that the child lived in 1855, and there was no estate between 1848 and 1860.

No recognition prior to the death of L. could legitimate the child or impart to it a heritable quality, there being no law then in force recognizing such recognition. The act of 1859 cannot reach back.

This action was commenced in April 1862, by defendant in error, against the plaintiffs in error, to recover section or reserve No. 9 of Kansas half-breed Indian lands in Jefferson county, containing six hundred and forty acres. The cause was tried Oct. 27, 1863, by the court, (parties waiving a jury,) and judgment given for defendants. A new trial was granted under section 574 of the Civil Code. May 5, 1864, the new trial was had before a jury, who, under the charge of the court found for plaintiff below and

judgment was entered accordingly. The instructions set forth in the opinion of the court were on this trial asked by defendants below (plaintiff in error,) and refused. The case comes up on exceptions to that ruling of the court.

The case was argued in Supreme Court by *Wilson Shannon*, for plaintiffs in error, and by *David Brockway*, for defendant in error.

*Wilson Shannon*, for plaintiffs in error, submitted a brief which has been mislaid beyond the reach of the reporter.

*J. & D. Brockway*, for defendant in error, submitted:

1. The act of Congress of 1860, giving to the heirs of deceased reservees certain lands (p. 21, acts of Congress 1860, as modified by the joint resolution of 1862, p. 363,) granted the land described in the petition below to the legal heirs of Lavonture the child of Francis Lavonture. It is direct and positive in terms, and there is nothing to indicate that Congress intended any other construction to be placed upon it. Neither is there any room for a different construction to be put upon the act. To give it the construction placed upon it by the counsel for the plaintiff in error, would be absurd. Lavonture died in 1847 or 1848. The persons upon whom the law of the land at the time of Lavonture's death cast his estate became his heirs, and no subsequent legislation (if there had been any attempt to do it,) could divest them of the character of his heirs, and it is to his heirs that the act of 1860 gives the land mentioned in the petition below. The word heirs is used as a *descriptio personæ*, and has a precise meaning, leaving no room for construction. *Campbell* v. *Rawdon*, 18 *N. Y.*, 412-421; 4 *Bacon's Abr.*, 608; 2 *Blackst. Com.*, 201-134-5; *Miller* v. *Miller*, 10 *Met.*, 393-400; *Abby* v. *Dale*, 73 *Eng. Com. Law Rep.*, 390.

2. The law in force at the time of the death of Lavonture determines who are his heirs. This was the act of the

territorial legislature of Missouri, passed Jan. 21, 1815, this state then being a part of the territory of Missouri, and said act never having been repealed until after the death of Lavonture, continued the law by which his property would descend and his heirs be determined. *See Treaty of Cession of Louisiana*, 8 *U. S. Stat. at Large*, 200; *also Act of Cong. Enacting Ter. of Mo.*, 2 *U. S. Statute at Large*, 743; *Ter. L. Mo.*, 401-2-3, *secs.* 13-17-20.

Wherever there was no provision contrary to the common law of England and statutes made by the British Parliament prior to the fourth year of James I., in the statutes of Missouri territory, then the common law and said statutes were in force. *Laws Mo. Ter.*, *p.* 436, (*Act Jan.* 19, 1816.)

3. Jane Brown, if she had been the lawful wife of Lavonture, could not as such wife be his heir at common law. She was not of kin to him. *Lucus* v. *N. Y. Cent. R. R. Com.*, 21, *Barb.*, 245; 2 *Blackst. Com.*, 209-220; 27 *Eng. Com. L. Rep.*, 516-518, (*Wells et al.* v. *Lounds.*)

Nor could she under the act above cited inherit from his child property descending from Lavonture to the child. It would go to the next of kin. *Mo. Ter. L.*, 401, *secs.* 13-17-20.

Nor even under our present act concerning descents and distributions, were that the law governing the descent. *Comp. L.* 470, *secs.* 16 *to* 21 *inclusive.*

By the terms of the exceptions No. 1 and 2, Jane Brown must be the "only" or "sole" heir to Louis Lavonture or there was no error in refusing to give the instructions asked.

By the terms of the charge No. 1, Jane Brown must be the "sole heir," and the statutes of the territory of Kansas the law to govern a descent cast in 1847 or '48, or there was no error in refusing the charge asked to be given.

By the terms of the charge No. 2, Mrs. Brown must be the "only heir" of Lavonture or there could be no error in refusing the charge asked to be given.

4. If the pretended marriage between Jane Brown and Lavonture took place during the life of her former husband, Martin Trapp, then the marriage was void and the children of the marriage would be bastards and incapable of inheriting. 2 *Blackst. Com.*, 247 ; 2 *Kent's Com.*, 43-4-212 ; 2 *Greenl. Ev.*, sec. 464 ; 2 *Hill. on Real Prop.*, sec. 464, *p.* 192 ; 4 *Bacon's Ab.*, 608 ; 4 *Kent's Com.*, 438 ; *Bent's Administrator* v. *St. Vrain*, 30 *Mo.*, 268 ; *Little* v. *Lake*, 8 *Ohio*, 289 ; *Cooley* v. *Dewey*, 4 *Pick.*, 93 ; *Stephenson's heirs* v. *Sullivant*, 5 *Wheat.*, 260 ; *Curtis* v. *Hewins*, 11 *Met.*, 294.

*By the Court*, CROZIER, C. J.

Upon the trial of this cause in the court below, the plaintiffs in error asked the court to charge the jury as follows :

I. "The statute law in force in the state of Kansas at the date of the act of Congress, entitled 'An act to settle the titles to certain lands set apart for the use of certain half-breed Kansas Indians in Kansas territory,' approved May 26, 1860, is the law by which the rights of the parties in this case are to be governed ; that in ascertaining who are the heirs of Louis Lavonture, we are required to look to the statute law of Kansas in force at the date of the said act of Congress. That by the law of the state of Kansas at the date of said act of Congress the defendant Mrs. Brown, would be the sole heir of Louis Lavonture, if the jury should be satisfied from the evidence in the case that Lavonture and Mrs. Brown were lawfully married ; and that Lavonture died before 1860, having a child living, which child died prior to 1860, leaving no child or children,

II. "That if the jury are satisfied from the evidence in the case that Martin Trapp, the former husband of Mrs, Brown, was dead, and that after his death the defendant Mrs. Brown and Louis Lavonture were married, then upon the death of Louis Lavonture without children, Mrs. B,

would be under the laws of Kansas, and the said act of Congress, the only heir of Louis Lavonture, her deceased husband.

III. "That if the jury are satisfied from the evidence in the case that Mrs. Brown and Lavonture were married according to the forms of law, the issue of said marriage would not be bastard and incapable of inheriting from Lavonture on his death, although Mrs. Brown may have had another husband living at the time of her said marriage with Lavonture. That if the jury were satisfied from the evidence, Louis Lavonture had a child by the said defendant Mrs. Brown after said marriage, the said child would be entitled as heir to all the interest and right of the said Lavonture in said reserve or section numbered 9; and upon the death of the said child without a child or children, the said interest in said section would pass to and vest in Mrs. Brown, the mother of said child."

The court refused to give these instructions or either of them, and a verdict and judgment were rendered for the defendant in error. We are asked to reverse the judgment on the ground that the court erred in refusing so to instruct the jury.

Prior to 1825, the Kansas nation of Indians had what is known as the Indian title to a large body of lands in the eastern portion of this state, including the lands in controversy. On the 3d of June of that year, that nation made a treaty with the United States by which the Indians ceded to the government the said lands subject to the reservation mentioned in the sixth article of the treaty. That article is in the following words:

VI. "From the lands above ceded to the United States, there shall be made the following reservations of one mile square for each of the half-breeds of the Kansas nation, viz: for Adel and Clement—the two children of Clement; for Josette, Julie, Pelagie and Victoire, the four children of Louis Gouvil; for Marie and Lafleche, the two children of

Baptiste of Gouvil; for Lavonture, the son of Francis La-
vonture; for Elizabeth and Pierre Carbonare, the children
of Pierre Brisee; for Louis Joucas; for Basil Joucas; for
James Joucas; for Elizabeth Dolcharute, daughter of Bap-
tiste Dolcharute; for Joseph Butter; for William Rodgers;
for Joseph Cote; for the four children of Cicile Compare—
each one mile square, and for one Joseph Joucas; to be
located on the north side of the Kansas river, in the order
above named, commencing at the line of the Kansas res-
ervation, and extending down the Kansas river for quan-
tity."

Lavonture, the son of Francis Lavonture, mentioned in
the foregoing article, died in 1847 or '48.

On the 26th day of May, 1860, Congress passed an act
upon the subject of these lands. After reciting the above
article, the first section provides : " That all the title, inter-
est and estate of the United States, is hereby vested in the
said reservees, who are now living, to the land reserved,
set apart and allotted to them, respectively, by the said
sixth article of said treaty; and in case any of the said res-
ervees named in the said sixth article are deceased and
leaving heirs, then all the title, interest or estate of the
United States to the land allotted to such deceased reser-
vees, is hereby vested and confirmed in such persons as
shall by the Secretary of the Interior be decided to be the
heir of such deceased reservees; but nothing herein con-
tained shall be construed to give any force, efficacy or bind-
ing effect to any contract in writing or otherwise for the
sale or disposition of any lands named in this act hereto-
fore made by any of said reservees or their heirs."

The second section provides that in case any of the res-
ervees or their heirs shall not desire to occupy the lands,
the Secretary of the Interior may sell them for their bene-
fit. The third section directs what shall be done with the
proceeds of such sales.

On the 17th of July, 1862, Congress passed a joint reso-

lution, providing: "That sections two and three 'of the above act' and so much of the first section as authorized the Secretary of the Interior to decide what persons are heirs to deceased reservees as mentioned therein, be and the same is hereby repealed."

The first question to be considered is, by what rule shall it be ascertained who are meant by the words "heirs of such deceased reservees" as used in the act of Congress.

Prior to the treaty of 1825, the Kansas nation of Indians had the Indian title to the land in controversy, *i. e.* the right to use, occupy and enjoy. This title was by the sixth article vested in Lavonture. His title was no greater than that of the nation had been. The nation's title was transferred to and vested in him, individually. After the boundaries were ascertained in the manner contemplated by the treaty, he was the sole owner of section No. 9 to the extent of the Indian title. His interest did not amount to an estate of inheritance, but was a mere life interest in the resufruct. There are no words in the treaty which upon any known rule of interpretation, would create an estate of inheritance. Before the treaty the "United States held the ultimate title charged with the right of undisturbed occupancy and perpetual possession in the Indian nation" so long as it should remain a nation. Had the nation become extinct without a treaty, the lands would have become the property of the United States, disencumbered of the Indian title. So, after the treaty Lavonture having but a life estate to the extent of the Indian title in section nine, should he die with or without issue, the whole title to that section would vest in the United States. The record shows that he did die in 1847 or '48. Therefore from that time to the passage of the act of May 26, 1860, the whole title to the lands in controversy, was in the government. That act operated as an original grant to the persons who shall be ascertained to be meant by the word "heirs" used therein.

It was insisted in the argument that whoever would un-

der the law have inherited the real estate generally of La-
vonture at the time of his death, are the persons meant by
the word " heirs" in the act of Congress. If we are right
in our construction of the 6th article, upon Lavonture's
death, there was nothing so far as section nine was con-
cerned, for such heirs to take. Had there been there would
have been some force in the assumption that it was the in-
tention of Congress to add the ultimate title to the Indian
title. But we know of no rule of construction that would
authorize such a conclusion.

Assuming, as above intimated, that the act of Congress
operated as an original grant and that the words " heirs of
deceased reservees" are merely *descriptio personæ*, the
question is of comparatively easy solution. Had Lavon-
ture been living at the time of the passage of the act the
title would have vested in him ; and if he had died the
next day, there can be no question that his heirs would
have been determined by the law of the state at the time
of his death. And it would have made no difference if he
had lived for a year and the law of descents been changed
in the meantime; the law at the time of his death would
have furnished the rule. And why? Not simply because
of his death at the particular time, but because that was the
time at which the estate would pass. The law at the time
the estate passes, furnishes the rule. To illustrate : sup-
pose there was on a certain day conveyed to a man a life
estate in a certain piece of property then to go to his heirs
generally, and at the time of the conveyance the law would
in case of his death give one half to his brothers and sis-
ters and the other half to his children. But before he dies
the law is changed so as to give the whole to his children,
would there be any question of the right of his children to
the whole property? Certainly not; because the word
heirs in the deed would be construed with reference to the
statute in force at the time the estate would pass, and not
with reference to the law at the time the deed was execu-

ted. So in the case at bar. The whole title being in the United States passed on the 26th day of May, 1860, the date of the approval of the act of Congress; and whoever at that time would inherit from Lavonture under the law of the state are the heirs referred to in the act.

Our conclusion, therefore, upon this branch of the case is that the persons who under the laws of this state would have inherited the real estate of Lavonture had he died on the 26th day of May, 1860, are the persons to whose benefit the grant made by the act of Congress of that date inured; and this brings us to the consideration of the instructions prayed for and refused by the court below.

With the first clause in the first instruction asked, we have no fault to find, but we have been unable to find any statutory provision which would give to the mother the whole of the estate under the circumstances indicated in the instruction. It seems to have been framed under the 18th and 19th sections of the act of Feb. 8, 1859, (*Comp. L. p.* 470) but counsel seems to have overlooked the contingency upon which the mother would take under these sections. She could only take in case there was neither wife nor husband nor issue surviving. If counsel meant the word child to be understood as describing a very young person wholly ineligible to matrimony, then the instruction was right, and ought to have been given. But inasmuch as the term is used in the same statute with reference to all ages, the instruction is not strictly accurate, and for aught we can see, the whole of the testimony not being set out in the bill of exceptions, might have misled the jury, and was therefore properly refused.

To the second instruction we can see no objection. The 18th section of the act above referred to seems to fully sustain it. It should have been given to the jury.

Whether the refusal to give the third instruction asked for was erroneous, depends upon the construction to be

given the 23d and 24th sections of the act concerning descents, already referred to.  They read as follows:

"Sec. 23.  Illegitimate children inherit from the mother, and the mother from the children."

"Sec. 24.  They also inherit from the father whenever they have been recognized by him as his children, but such recognition must have been general and notorious, or else in writing."

We have said that the law of which these sections are a part, controls the title to the land in controversy.  It was passed in February and took effect the 1st of June, 1859; and the question is not who would have inherited at common law, or under the civil law, or act of the territory of Missouri at the time of Lavonture's death.  The real question is: What is the meaning of the word "illegitimate" as used by the legislature of 1859?  So far as this controversy is concerned, it is wholly immaterial what was the law of descents at the time of Lavonture's death; there was no estate upon which it could operate.  The inquiry should not be what illegitimacy there meant or what were its consequences, but what signification did our legislature intend it should bear?  What class of persons did they intend to describe by its use?  A careful examination of the 24th section will show that it is not necessary that children be legitimate in order to inherit from the father.  The issue of a man and his mistress might inherit from the father if recognized as his children in the manner pointed out by the statute; yet the issue would nevertheless be illegitimate.  The recognition would not make them legitimate but merely give to them the quality of inheritors.  Therefore the law-makers did not intend to be understood as describing by the word "illegitimate" a class who could not inherit from the father.  Nor are we left to philology to determine what they did mean by the word.  An act of the same body passed at the same session, (*Comp. L., p.* 838,) provides that, "technical words and phrases and

such other as may have acquired a peculiar and appropriate meaning in law shall be construed according to such peculiar and appropriate meaning." The same legislature also provided that in the absence of statutes the common law of England except in criminal cases should be the law of the land and the rule of decision. What then is the meaning of illegitimate children under the common law? All the books say that children born out of lawful wedlock are "illegitimate;" and it was wholly immaterial whether the parents had sought to unite themselves in a marriage which was void or had wholly ignored every pretence of marriage. There must have been a valid marriage in order that the issue be legitimate, and there could be no valid marriage if a husband or wife were living,—the marriage relation still subsisting. The second marriage of a woman who had a husband then living, was wholly void; and the issue of such second marriage was said to be illegitimate. This is by the common law the "peculiar and appropriate meaning" of the phrase used in our statute, and we are obliged in statutory silence upon the subject to give it that interpretation.

And it is insisted that notwithstanding the marriage described in the proposed instruction to the jury would have been at common law null and void, yet the child was legitimate because by the statute of 1855 (p. 308, sec. 10,) it was provided that the issue of all marriages deemed null and void should be legitimate. This provision was enacted in 1855 and repealed in 1859. The child was born before 1848, the father did not live after that year. The record does not show that the child was living in 1855, and there was no estate so far as this suit is concerned between 1848 and 1860 upon which the provision could operate even if the child were living. So that during the four years that this provision was in force there was neither child nor estate to be affected by it; and so far as this controversy is concerned the result is the same as if the provision had never been enacted.

It is said that there was sufficient evidence to warrant the jury in finding that the father did in the manner required by the statute recognize the child as his own, and for that reason the third instruction should have been given to the jury. Whether there was or was not such testimony is wholly immaterial. No recognition prior to the death of Lavonture, however general or notorious, nay, although it were in writing, could legitimate the child if born out of lawful wedlock, or impart to it a heritable quality. At the time the recognition must have taken place, there was no law in force giving to that act such an effect. To give it any legal effect whatever there must have been some law in existence prescribing what that effect should be. The act of 1859 cannot reach back and attach to an action, which at the time of its performance was entirely indifferent, such grave, legal consequences. The construction contended for would admit the power of the legislature to unsettle some of the clearest titles in the state.

We are therefore of opinion that if the child of Lavonture were born under the circumstances set out in the instruction asked for, it would be illegitimate within the meaning of the act of 1859, and could not inherit from its father, and that the court below did not err in refusing to charge the jury as requested in the third instruction.

We do not intend to be understood as expressing an opinion as to the result had there been an attempt upon the trial to show what was the status of the child of Mrs. Brown and Lavonture under the usages and customs of the Indian tribe or other peculiar regulation of the place of the child's nativity.

Our conclusion is that the judgment of the court below ought to be reversed and a new trial awarded on the ground that the court erred in refusing to charge the jury as requested in the second instruction.

All the Justices concurring.