JOHN CALDWELL V. D. B. MILLER et al.

1. PREËMPTION — *Heirs of Deceased Pre-emptor* — *Patent, Construed.* Where a party entitled to the benefits of the preëmption laws of the United States makes a preëmption filing in this state, but dies before consummating his claim, and his administrator files the necessary papers to complete the same, and upon payment for the land obtains from the United States a patent granting the land unto the "heirs of the deceased preëmptor," the word "heirs" in the patent is to be construed with reference to the laws of this state; and whoever, under the laws of this state, would have inherited from the deceased preëmptor, are the persons to whose benefit the land granted by the patent inures.

2. ILLEGITIMATE CHILDREN, *Inherit, When.* Under the statutes of Kansas, illegitimate children inherit from the father, the same as the legitimate children, when such illegitimate children have been generally and notoriously recognized by him as his own.

3. FACTS, *Stated* — *Word "Heirs" Includes Illegitimate Children.* On the 10th of July, 1871, T. made a preëmption settlement upon a quarter-section of land in Reno county; he died before consummating his claim to the preëmption; the administrator of his estate completed the preëmption, and on the 20th of April, 1874, obtained a patent from the United States to the land; the patent granted unto the said heirs of T. deceased, (the dead preëmptor) and to their heirs, the tract preëmpted; T., at the time of his death, had living a legitimate child, and also illegitimate children, whom he had generally and notoriously recognized as his own. *Held,* That the word "heirs" in the patent included the illegitimate children as well as the legitimate child.

*Error from Reno District Court.*

ON the 30th day of June, 1885, John Caldwell brought his action to have his title established to and recover possession of the northeast quarter of section 12, township 23 south, range 6 west, in Reno county. On January 24, 1887, the case was submitted to the court, a jury being waived. The court was requested by both parties to find separately the facts and law. After hearing all the testimony the court took the case under advisement until the 6th of April, 1887. At that time the court made and filed the following findings of fact:

"1. On January 1, 1809, one Robert Titus, mentioned in

plaintiff's petition, was lawfully married, at Sudbury, in Rutland county, Vermont, to one Phœbe Thomas; and that in October, 1810, there was born as the issue of that marriage a son, Alden Wheeler Titus, who was the only issue of that marriage.

"2. After the birth of said son, Alden Wheeler Titus, the said Robert Titus abandoned his said wife and son and went into the war of 1812, and never lived with them any more.

"3. Said Robert Titus went from said war to East Bloomfield, in Ontario county, in the state of New York, and on July 14, 1818, without having been divorced from said Phœbe, married Miriam Lee, by whom he had five children thereafter born, viz.: Benjamin, a son, Betsey, a daughter, Rachel, a daughter, Delight, a daughter, Lois, a daughter.

"4. Said Robert Titus thereafter, about the year 1832, removed from Ontario county, New York, to Lenox, Macomb county, Michigan.

"5. Defendant Lois Miller is the wife of the defendant D. B. Miller, and is the youngest daughter of said Robert Titus and Miriam Lee.

"6. Robert Titus, in the year 1850, came to live with said D. B. Miller and Lois Miller, his wife, and continued to live with them from that date until his death, in 1871.

"7. D. B. Miller and his wife Lois and said Robert Titus came to Reno county, Kansas, from Will county, in the state of Illinois, and settled there in the year 1871.

"8. Robert Titus on July 10, 1871, made a preëmption settlement upon the land in controversy in this suit, viz.: N.E.¼ sec. 12, township 23, range 6 west, Reno county, Kansas; and thereafter, on September 8, 1871, died, not having completed his preëmption as required by act of Congress of March 3, 1843. (Rev. Stat. U. S. of 1878, § 2269.)

"9. Robert Titus died intestate and utterly without any money or property whatever. Upon his death said D. B. Miller was by the probate court of Reno county, Kansas, appointed administrator of said Robert Titus, deceased, and with his own money caused said preëmption to be completed, paying the double-minimum price for said land to the government, viz.: $400. This was done in the year 1871.

"10. On the completing of said preëmption by said D. B. Miller as administrator, a patent for said land was issued by the United States under and in accordance with the section 2269, Revised Statutes U. S., a copy of which is hereunto

annexed, marked 'Exhibit A,' and made a part of these findings.

"11. Robert Titus died in Reno county, Kansas, intestate, on September 8th, 1871.

"12. Miriam Lee died intestate, in the year 1853.

"13. His said wife, Phœbe Thomas Titus, died in Rutland county, Vermont, in the year 1860.

"14. Alden W. Titus, son of Robert and Phœbe Titus, died in Charlestown, Mass., in the year 1876, intestate, leaving heirs."

"16. Defendant D. B. Miller has purchased from said heirs of Alden W. Titus, and under proper conveyances from them is the owner of all the rights, title and interest in said land which inured to the said Alden W. Titus's benefit as the heir of said Robert Titus under said patent.

"17. Plaintiff has conveyances from the following aforesaid named children of said Robert Titus and Miriam Lee, viz.: Delight, intermarried with one Caldwell, the father of plaintiff, and Rachel, intermarried with Crandall, conveying to him whatever title they had in said land in controversy.

"18. Said Betsey, intermarried with Nathan Hicks, died, to wit, on the — day of ——, and left surviving her, and who are still living, Nathan Hicks her husband, her son Volney Hicks, her daughter Melissa West, her daughter Ada Wade, and her daughter Arabel Snyder.

"19. Said plaintiff has procured and has from said Volney, Melissa, Ada, Arabel, deeds of conveyance, conveying to him all their several interests in the land in controversy, and from James and Joseph Miller.

"20. D. B. Miller has procured from said Nathan Hicks and has a deed of conveyance conveying to him all the right, title and interest which said Nathan Hicks had in said premises, as the surviving husband of said daughter Betsey.

"21. Benjamin Titus died in the year 1852, and left his widow, who is still living, and three daughters, two of whom are still living. The other daughter, Elmira, married Amos Miller, and had seven children; said Elmira died in the year 1885, leaving surviving her her said husband and the said seven children, all of whom are still living."

"23. Defendant D. B. Miller has proper conveyance of the land in controversy from said Amos Miller, and from three of the said sons of Elmira, viz.: William, conveying to him all the right, title and interest in said land of which they were

respectively entitled to as heirs of said Benjamin Titus, deceased.

"24. Said children of Robert Titus and Miriam Lee were notoriously recognized by Robert Titus as his own, and no question was ever raised as to their legitimacy, until in this suit.

"25. Plaintiff demanded to be let into possession March 4, 1885.

"26. If the Miriam Lee children of Robert Titus are heirs within the meaning of the act of Congress, § 2269, U. S. Revised Statutes 1878, then the plaintiff is entitled to receive an undivided $\frac{13}{28}$ of the said land, and damages for its detention since that time at the rate of $41.67 per year.

"The said D. B. Miller claims all of the land under the said act of congress and under the conveyances of the legitimate heirs of Robert Titus to him; and if legitimate children only are heirs under said act of congress, then the defendants are entitled to recover."

### EXHIBIT A.

"*The United States of America, to all to whom these presents shall come—Greeting:* (Certificate No. 593.) Whereas, D. B. Miller, administrator for the heirs of Robert Titus, deceased, of Reno county, Kansas, has deposited in the general land office of the United States a certificate of the register of the land office at Wichita, Kansas, whereby it appears that full payment has been made by the said D. B. Miller, administrator, according to the provisions of the act of Congress of the 24th day of April, 1820, entitled 'An act making further provisions for the sale of the public lands,' for the northeast quarter of section 12, township 23, range 6 west, in the district of lands subject to sale at Wichita, Kansas, containing one hundred and sixty acres according to the official plat of the survey of the said lands returned to the general land office by the surveyor general, which said tract has been purchased by the said D. B. Miller, administrator:

"Now know ye, that the United States of America, in consideration of the premises and in conformity with the several acts of congress in such cases made and provided, have given and granted, and by these presents do give and grant unto the said heirs of Robert Titus, deceased, and to their heirs, the above tract above described, to have and to hold the same, together with all the rights, privileges, immunities and appurtenances of whatsoever nature belonging, unto the said heirs

of Robert Titus, deceased, and to their heirs and assigns forever.

"In testimony whereof, I, Ulysses S. Grant, President of the United States of America, have caused these letters to be made patent, and the seal of the general land office to be hereunto affixed.

"Given under my hand, at the city of Washington, the 20th day of April, in the year of our Lord one thousand eight hundred and seventy-four, and of the independence of the United States the ninety-eighth.

"By the President: U. S. GRANT.

By A. WILLIAMSON, *Secretary.*

"L. K. LIPPENCOTT, *Recorder of the General Land Office.*

Recorded in volume I, page 386.

(Seal.) General Land Office U. S."

And thereon the court made the following conclusion of law:

"From the foregoing findings of fact the court finds for the defendants; to all of which plaintiff excepts."

The court then rendered judgment for D. B. Miller, adjudging him the owner in fee simple of the northeast quarter of section 12, township 23 south, range 6, in Reno county, and entitled to the lawful possession of the same; and further rendered judgment that he and D. B. Miller were in the lawful possession of the property at the commencement of the action. The plaintiff filed a motion for a new trial, which was overruled. He excepted, and brings the case to this court.

*Brown & Kline,* for plaintiff in error.

*Vandeveer & Martin,* and *Almerin Gillett,* for defendants in error.

The opinion of the court was delivered by

HORTON, C. J.: On the 10th day of July, 1871, Robert Titus made a preëmption settlement upon the land in controversy, being a quarter-section of land in Reno county, in this state. He died before consummating his claim of preëmption. After his death, D. B. Miller, administrator of his estate, filed the necessary papers to complete the preëmption, paying

the price thereof, $400, from his own money to the United States.   On the 20th day of April, 1874, a patent to the land was issued by the United States.   The patent, among other things, recited that —

"The United States of America, in consideration of the premises and in conformity with the several acts of congress in such cases made and provided, have given and granted, and by these presents do give and grant unto the said heirs of Robert Titus, deceased, and to their heirs, the above tract described, to have and to hold the same, together with all the rights, privileges, immunities and appurtenances of whatsoever nature thereunto belonging, unto the said heirs of Robert Titus, deceased, and to their heirs and assigns forever."

Robert Titus, who made the preëmption settlement, was married to Phœbe Thomas in Vermont, in 1809.   The only issue of this marriage was Alden W. Titus, born in October, 1810.   After the birth of his son, Robert Titus abandoned both his wife and child.   Without having a divorce, he had a marriage ceremony performed between him and Miriam Lee, in the state of New York, on July 14th, 1818.   By Miriam Lee he had five children.   The youngest was the daughter Lois.   Lois married D. B. Miller, one of the defendants. In 1871 D. B. Miller, his wife and Robert Titus came to this state from Illinois, and settled in Reno county.   Soon after, Titus preëmpted the land now claimed by Miller.   Miriam Lee died in 1853.   Mrs. Phœbe T. Titus died in Vermont, in 1860.   Alden W. Titus, the son by Mrs. Phœbe T. Titus, died in 1876, intestate, leaving heirs.   D. B. Miller purchased from the heirs of Alden W. Titus, deceased, all their right and title to the land in dispute, and claims the fee-simple title thereof by conveyances from them as the only heirs of Robert Titus, deceased.   John Caldwell, the plaintiff, is a son of Delight, a daughter of Robert Titus by Miriam Lee, and claims a portion of the land from her and through conveyances from several of the children and heirs of the children of Miriam Lee.

The pivotal question is the interpretation of § 2269, Revised Statutes of the United States, 1878.   This question is

2 — 44 KAS.

one which may ultimately be decided by the supreme court of the United States; therefore the final decision does not rest with us. The section reads:

"Where a party entitled to claim the benefits of the preemption laws dies before consummating his claim, by filing in due time all the papers essential to the establishment of the same, it shall be competent for the executor or administrator of the estate of such party, or one of the heirs, to file the necessary papers to complete the same; but the entry in such cases shall be made in favor of the heirs of the deceased preemptor, and a patent thereon shall cause the title to inure to such heirs as if their names had been specially mentioned."

The plaintiff contends that the words "the heirs of the deceased preëmptor" include legitimate and illegitimate children, if the illegitimate children were generally and notoriously recognized by Robert Titus in his lifetime as his own. Under this rule, the heirs of Alden W. Titus, deceased, and the children of Miriam Lee, or their heirs, are all heirs of Robert Titus, deceased. This would give John Caldwell an undivided thirteen twenty-eighths of the land, and damages for its detention.

On the other hand, the defendants claim that the word "heirs" must be determined by the common law of England. Therefore it is contended by them that the heirs of Alden W. Titus, deceased, had the sole right to the land prior to their conveyances to D. B. Miller. This would give all the land to Miller.

In interpreting the United States statutes, the question is not what congress has the power to do, but what congress has actually done. Congress has not defined the term "heirs." The land is situate in this state. Robert Titus died in this state. Therefore, to determine who are meant by the words in the patent, "heirs of Robert Titus, deceased," we think we must look to the statutes of this state. "It seems to us scarcely necessary to say that this is purely a question of statutory law." (*McKinney v. Stewart*, 5 Kas. 391.) "An heir is one who by statute is capable of inheriting from another, or one who suc-

ceeds to the estate of a deceased." (*McKinney v. Stewart*, supra; *Delashmutt v. Parrent*, 40 Kas. 641.)

In the act concerning descents and distributions are the following provisions, which are now in force, and were also in force at and before the death of Robert Titus:

"SEC. 22. Illegitimate children inherit from the mother, and the mother from the children.

2. Illegitimate children, inherit, when. "SEC. 23. They shall also inherit from the father, when they have been recognized by him as his children; but such recognition must have been general and notorious, or else in writing." (Gen. Stat. of 1889, ch. 33, pp. 780–787.)

3. Illegitimate children included among heirs. Under this statute, as the children of Miriam Lee were generally and notoriously recognized by Robert Titus as his own, they inherited from their father with Alden W. Titus, the legitimate child. The conclusion of law of the district court in favor of the defendants is therefore erroneous.

That the statute of this state must determine who are "heirs," is in accord with the prior decisions of this court. In *Brown v. Belmarde*, 3 Kas. 41, the syllabus reads:

"Prior to the treaty of June 3, 1825, with the Kansas Indians, they had the 'Indian title,' *i. e.*, a life interest in the usufruct, of a body of land in eastern Kansas, including that in controversy, the United States holding the ultimate title, charged with this interest of the Indian Nation, so long as they should remain a nation. This 'Indian title' was by the sixth article of that treaty vested in certain individuals — that to the land in question in Lavonture.

"From the death of Lavonture, in 1847 or 1848, to the passage of the act of congress, May 26, 1860, the whole title to the land in question was in the government, and that act operated as an original grant to certain reservees and the 'heirs of deceased reservees' mentioned therein. 'Heirs of

1. The word "heirs" in patent, how construed. deceased reservees' used therein is *descriptio personæ*, and is to be construed with reference to, and determined by the law at the time the estate passed, and whoever under the laws of this state would have inherited, had Lavonture died May 26, 1860, (the date of the approval of the act of congress,) are the persons to whose benefit the grant inured."

In *Clark v. Lord*, 20 Kas. 390, it is said:

"The patent was not issued to Eleanor Richardson, but to 'the heirs of Eliza Richardson,' and said Eleanor Richardson obtained her interest, not as an allottee, not as the patentee, but by virtue of the laws of the state of Kansas, which authorized her, as an heir of Eliza Richardson, to inherit the estate of her sister. If Eliza had lived, the lands would have been allotted and patented to her. After her death they were patented to her heirs, without naming them; and the law of the state determined who these were. Eleanor simply inherited the lands granted to Eliza during her life; and the patent is evidence of the partition of the lands, and the division made in pursuance of the treaty. The death of Eliza Richardson did not change the terms and conditions of the treaty, nor annul the grant to her; but as the patent could not issue to a dead person, it was necessarily issued to the heirs of Eliza; but such heirs were not controlled by the restrictions applicable to the allottees and patentees. If the patent had issued to Eliza in her lifetime her death would have abrogated the restrictions on the alienation of the land; and having issued after her decease, it placed the heirs in the same condition, as to their rights in the property, as if issued before."

See also *Cutting v. Cutting*, 6 Sawyer, 396–406; 21 Myers's Federal Decisions, 370, 371–399; *Lamb v. Starr*, 1 Deady, 358.

Defendants cite *McCool v. Smith*, 1 Black, 459, but we do not think that decision is authority for them. "Next of kin" is construed in that case by the common-law definition, for the reason that the common law of England was in force by express statute in the state of Illinois at the death of the party referred to in the opinion. If we were required to go outside of the statutes of this state and to the common law of England to determine what is meant by the term "heirs," we should have insuperable difficulties to encounter. If we are not to construe "heirs" in this case by the statute of this state, it is impossible to determine, as congress has not adopted the common law of England, what part or portion of the common law of that country is applicable.

Among the canons of descent, as enumerated by Blackstone,

are two which are wholly inapplicable to this country, and which could never have been within the intention of congress to apply in this state, or any other state of the Union.  One of these common-law canons is, "that where there are two or more males in equal degree, the eldest only shall inherit; but the females all together.  As, if a man has two sons, Matthew and Gilbert, and two daughters, Margaret and Charlotte, and dies, Matthew, his eldest son, shall alone succeed to his estate, in exclusion of Gilbert, the second son, and both the daughters; but if both the sons die without issue before the father, the daughters, Margaret and Charlotte, shall both inherit the estate as co-parceners."  The other canon is, "that the male issue shall be admitted before the female.  Thus, sons shall be admitted before daughters; or, as our male lawgivers have somewhat uncomplaisantly expressed it, the worthiest of blood shall be preferred.  As, if John Stiles hath two sons, Matthew and Gilbert, and two daughters, Margaret and Charlotte, and dies; first Matthew and (in case of his death without issue) then Gilbert, shall be admitted to the succession, in preference to both the daughters." (2 Bl. Com. [Wendell], pp. 212, 213.)

We do not think it necessary to comment upon the attempted removal of this case to the United States circuit court.  After the application for removal was denied by the district court, the parties filed new pleadings and entered into various stipulations and wholly disregarded any attempted removal.

The judgment of the district court must be reversed, and the cause remanded, with direction to the court below to enter judgment upon the findings of fact in favor of John Caldwell and against the defendants for the undivided $\frac{13}{28}$ of the land and damages for its detention from March 4, 1885, at the rate of $41.67 per year.

All the Justices concurring.